## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALEXANDER JIGGETTS     *

Plaintiff     *

v     *     Civil Action No. JFM-15-2954

STATE OF MD BEHAVIORAL HEALTH     *
ADMINISTRATION, et al.
    *

Defendants

    ***

## MEMORANDUM

Defendants filed a Motion to Dismiss or for Summary Judgment (ECF 3) in the above-entitled civil rights action. Plaintiff was advised of his right to file an opposition response and of the consequences of failing to do so, but has filed nothing further in the case. *See* ECF 4. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons that follow, defendants' motion, construed as a motion for summary judgment, shall be granted and the complaint shall be dismissed.

### Background

Plaintiff Alexander Jiggetts ("Jiggetts") is a patient at Spring Grove Hospital, a mental health facility in Catonsville, Maryland, where he is involuntarily committed after having been found not competent to stand trial on criminal charges of telephone misuse. In his complaint, Jiggetts alleges that defendants have discriminated against him as he is a practicing Muslim and should fast at least three times a month because "it is prescribed by the Prophet Muhammad." ECF 1 at p. 1. He explains he has been a Muslim "since birth" but only began studying and embracing Islam since 2003 – 2004. *Id.*

Jiggetts asserts that when he attempts to fast at Spring Grove the staff identify the practice as evidence of a mental disorder. He claims he was moved to "Red Bricks #3" in December of 2014, where he is accused of engaging in self-harm every time he stops eating. ECF 1 at p. 1. He claims he is threatened with forced medication if he does not begin eating again and that he has in fact been force medicated. In addition to the fasting requirements, Jiggetts alleges he is only supposed to eat Halal foods and the food served at Spring Grove is not Halal. Jiggetts adds that the food that is served tastes horrible and "sometimes has bubbles floating around in it." *Id.*

Jiggetts states that staff have expressed concern for his health because he is losing weight and have advised him that taking his medication will help him gain weight. *Id.* at p. 2. According to Jiggetts, however, the medication "makes gives everybody a gut" while he continues to "eat enough food to survive" and does not "have the big stomach like everybody else." *Id.* Jiggetts states the food served is not what he is used to as he generally eats foods from Whole Foods or Trader Joe's. *Id.*

Specifically, Jiggetts claims that Dr. Chineye Ekoh, who is a psychiatrist, told him he would not take Jiggetts before a clinical review panel for consideration of forced medication if he "didn't present any problems." *Id.* He claims, however, that "Head Nurse Ms. Oiche, Dietician Francine, and all of the charge nurses" tell the doctor that Jiggetts is not eating and that he needs to be medicated. *Id.*

Jiggetts states he does not engage in fights and avoids problems that arise in the dayroom, but despite his good behavior he has been taken before a clinical review panel repeatedly. ECF 1 at p. 3. He claims that he "won" a clinical review panel in July of 2014 and the subsequent panels constitute double jeopardy because "they keep punishing me [more] than once for the

2

same offense." *Id.* Jiggetts admits that the clinical review panels that have occurred since his move to Red Brick #3 were convened because "in their eyes" he "won't eat, won't take baths, . . . had lice . . . , and . . . was provoking staff and patients to fight." *Id.* Jiggetts denies having lice, denies provoking anyone to fight, and asserts the allegations constitute slander. *Id.*

As relief, Jiggetts seeks an injunction requiring defendants to allow him to practice his chosen faith of Islam and to allow him to fast without being subjected to forced medication and monetary damages. *Id.* at pp. 3 – 4.

## Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but

the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

The undisputed facts presented by defendants, supported by affidavits under oath as well as verified medical records, establish that Jiggetts never expressed any religious basis for his refusal to eat meals; that the clinical review panels for medication over his objection were convened only after his continued refusal to take medication voluntarily resulted in significant deterioration in his mental status such that he presented a threat to himself, staff, and other patients; and that neither Jiggetts's practice of declining meals nor his religious beliefs played any role in decisions regarding forced medication. ECF 3.

In his affidavit Dr. Chinenye Ekoh, Jiggetts' treating psychiatrist, explains Jiggetts was committed to Spring Grove Hospital on December 2, 2013, and was initially prescribed Risperidone to treat his psychosis and Haloperidol, diphenhydramine, and lorazepam for agitation as needed. ECF 3 at Ex. 3, p. 2. Dr. Ekoh states that Jiggetts was occasionally compliant with oral administration of his medication on an emergency basis, but mostly refused to take it. *Id.* On January 14, 2014, Dr. Ekoh states that Jiggetts began throwing his roommate's belongings around the room. When staff attempted to redirect Jiggetts, they were unsuccessful and Jiggetts began telling the charge nurse, "I don't want to have sex with you." *Id.* He was offered intramuscular injection of medication which he accepted without the need for physical restraint. *Id.* Dr. Ekoh also notes other incidents where Jiggetts's behavior was problematic and disruptive.

On December 16, 2014, Jiggetts harassed a staff member and tried to convince the staff member to assist him in fleeing the hospital, offering to pay him $1500 for assistance. *Id.* When Jiggetts was transferred to Redbricks #3, he began refusing meals because of his belief there was "voodoo" in the food. *Id.*

On December 21, 2014, Jiggetts made three calls to 911 to report that Dr. Ekoh was trying to brainwash him with witchcraft and voodoo. *Id.* at p. 3. On the same day he chased another patient out of the bathroom with a closed fist and threatened the staff members who were attempting to intervene. Jiggetts also violently banged on the window at the nurses station, accusing the nurses of engaging in voodoo and conspiring against him. *Id.*

On December 24, 2014, the FBI called Spring Grove to report they had received three calls from Jiggetts who reported what they believed to be false allegations. *Id.*

On December 27, 2014, Jiggetts made several 911 calls, preventing other patients from using the payphone. *Id.*

On December 28, 2014, Jiggetts aggressively threatened patients and tried to pick a fight with other patients while standing in the medication line. *Id.*

On December 29, 2014, Jiggetts threatened another patient and attempted to engage the patient in a fight until staff intervened in the matter. Jiggetts also splashed water on another patient and again threatened staff on the same day. *Id.*

On January 1, 2015, Jiggetts made several 911 calls making false reports against hospital staff. *Id.* On the following day, Jiggetts tried to provoke a fight with a member of staff. *Id.*

Following this series of misconduct, Dr. Ekoh wrote a 72 hour emergency medication order to protect the safety of the other patients as well as staff. *Id.* The order for emergency medication was issued pursuant to hospital policy. *See* ECF 3 at Ex. 15. In addition to the

violence committed by Jiggetts against staff and other patients, he refused to shower or attend to any aspect of his personal hygiene and contracted lice, posing a health threat to both patients and staff. ECF 3 at Ex. 3, p. 4. After the 72 hour order expired, Dr. Ekoh prescribed medications, but Jiggetts refused, with the exception of two occasions, to comply with orders to take the medication. Thus, Dr. Ekoh convened a Clinical Review Panel for consideration of involuntary medication. *Id.*

On January 15, 2015, the Clinical Review Panel approved involuntary medication for Jiggetts. ECF 3 at p. 4. Jiggetts appealed the decision to the Office of Administrative Hearings ("OAH") and a hearing before an Administrative Law Judge ("ALJ") was scheduled. *Id.* In the meantime, Jiggetts attacked another patient. On January 20, 2015, Jiggetts punched another patient several times and claimed the patient was a member of the Black Guerilla Family gang. *Id.* Following that assault, Dr. Ekoh placed Jiggetts on one-to-one supervision so that he was constantly watched by a staff member. Despite that supervision, Jiggetts continued to threaten patients and staff, accusing them of engaging in voodoo. *Id.*

On January 27, 2015, an ALJ affirmed the Clinical Review Panel's recommendation to involuntarily medicate Jiggetts. *Id.* On February 11, 2015, following an appeal, the Circuit Court for Baltimore County affirmed the ALJ's decision resulting in a 90-day period of involuntary medication. *Id.* at p. 5. Jiggetts agreed to the oral administration of the medication due to his fear of injections. *Id.* Once medicated, Jiggetts began attending to his personal hygiene, stopped assaulting patients and staff; and his calls to 911 diminished. *Id.* Once the 90-day period expired, however, Jiggetts immediately began refusing the medication.

On April 14, 2015, a Clinical Review Panel recommended a renewal of the involuntary medication order. *Id.* That decision was upheld by the OAH on April 21, 2015, and affirmed by

the Circuit Court on May 12, 2015. *Id.* Dr. Ekoh relates that while Jiggetts was medicated he acquired competency to stand trial for his pending criminal charges, but his behavior in the courtroom during a hearing on June 18, 2015, caused the court to question his competency. *Id.* As a result, an examination by a forensic psychiatrist opined that Jiggetts required continued therapy with the goal of regaining competency. *Id.*

On July 14, 2015, the second Clinical Review Panel order expired and Jiggetts again immediately began refusing his medication. *Id.* at p. 6. Once Jiggetts stopped receiving medication he stopped eating and his condition deteriorated. *Id.* Jiggetts ate sporadically from the end of July to the beginning of October, basing his decision not to eat on his delusional belief that staff was tampering with the food. By the middle of October Jiggetts had lost 13 pounds. *Id.* Jiggetts began spending the day pacing up and down the hallway and became increasingly aggressive after stopping medication.

On October 12, 2015, Jiggetts bumped into another patient and repeatedly punched the patient in the face. When a third patient attempted to intervene in the assault, Jiggetts bit that patient on the thumb and forearm. *Id.* Emergency medication was given to Jiggetts as a result of the violent assault. *Id.* On October 22, 2015, another Clinical Review Panel again recommended involuntary medication of Jiggetts in order to protect the safety of other patients and of Jiggetts himself. *Id.*

Dr. Ekoh states that Jiggetts requires continuous medication in order to decrease his delusions and psychosis as well as for the prevention of violent and aggressive behavior. *Id.* Dr. Ekoh states that without medication Jiggetts will remain seriously mentally ill and will require continued commitment to Spring Grove as he is likely to injure himself without medication. *Id.* at pp. 6 – 7.

Dr. Ekoh's evaluation of Jiggetts parallels the evaluations of Jiggetts performed for purposes of determining competency as well as the observations made by staff. *See* ECF 3 at Ex. 4, 6, 7, and 14. In her affidavit, Uche Okpa, R.N., states that Jiggetts often refuses to eat when he not taking his medication because he is convinced "people are putting voodoo in his food." ECF 3 at Ex. 14, p. 2. She further avers that he "has never been force fed" and is free to go without food if he chooses to do so, which he has on many occasions. *Id.* She states that Jiggetts "has never been given medication because he refuses to eat," but has been "medicated when he is physically dangerous to other patients and staff." *Id.*

Defendant Francine Freeman, the registered dietician at Spring Grove Hospital, states she has had multiple conversations with Jiggetts regarding his dietary needs and is familiar with his requests. ECF 3 at Ex. 8. Specifically, she recalls a conversation with Jiggetts that occurred on July 24, 2014, when he asked about other patients who were receiving Ramadan meals. *Id.* at p. 2. She states that Jiggetts told her he had never practiced Ramadan before and did not know when it began or ended, but expressed curiosity about the meals as he thought he might like them better than what he was receiving. *Id.* Freeman documented the conversation in Jiggetts's progress notes. *See id.* at Ex. 8A. Freeman also relates that she attempted to talk to Jiggetts about his practice of skipping meals, but Jiggetts expressed no food preferences and assured her he ate enough to make sure he did not die. *Id.* at Ex. 8, p. 3.

Absent a prohibited reason for Jiggetts's involuntary medication, the claim that Jiggetts has been the subject of discrimination for his religious beliefs utterly fails. Jiggetts has a "'significant constitutionally protected liberty interest in avoiding the unwarranted administration of antipsychotic drugs.'" *Sell v. United States*, 539 U.S. 166, 178 (2003), quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990). "[W]hen the purpose or effect of forced

drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense." *United States v. Bush*, 585 F.3d 806, 813 (4th Cir. 2009). It is beyond dispute that the deprivation of a religious practice does not suffice as a legitimate governmental interest to overcome the protected liberty interest held by an involuntarily committed mental patient to avoid unwanted, forced medication. Where, as here, there is no evidence that  an asserted desire to practice a religious observance was ever communicated to defendants, there is no doubt that the First Amendment freedom retained by Jiggetts has not been abridged.

Nor is there any evidence that Jiggetts was involuntarily medicated for some other prohibited purpose. To the contrary, the undisputed evidence in the record establishes that Jiggetts was not involuntarily medicated until it was clear he presented a danger to the other patients, staff, and himself. Defendants owe a duty to the patients at Spring Grove Hospital to maintain their safe keeping and care. "Involuntarily committed mental patients retain a liberty interest in conditions of reasonable care and safety and in reasonably nonrestrictive confinement conditions." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). The Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own. *See DeShaney v. Winnebago*, 489 U.S. 189, 200 (1989); *Youngberg*, 457 U.S. at 324. Thus, defendants were obliged to take steps reasonably necessary to protect others from Jiggetts's violent assaults.

Defendants are entitled to summary judgment in their favor. A separate order follows.


2/4/16
Date

J. Frederick Motz

United States District Judge